2021 IL App (1st) 171199-U

FIRST DIVISION
June 21, 2021

No. 1-17-1199

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 00 CR 1820, 1821, 1822 |
| | ) | |
| | ) | |
| STANLEY WELLS | ) | Honorable |
| | ) | Arthur Hill, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE PIERCE delivered the judgment of the court.
PRESIDING JUSTICE WALKER and JUSTICE HYMAN concurred in the judgment.

## ORDER

¶ 1    *Held*:  The trial court did not err in dismissing petitioner's postconviction petition after a third stage evidentiary hearing. Petitioner did not receive ineffective assistance of postconviction counsel.

¶ 2    Petitioner, Stanley Wells, appeals from the third stage dismissal of his postconviction petition.  He argues that the court erred when it dismissed his petition following an evidentiary hearing where he was denied ineffective assistance of plea counsel when plea counsel failed to move to withdraw his plea and failed to consult with him after he entered his plea.  He also

argues that he received ineffective assistance of postconviction counsel. For the following reasons, we affirm the judgement of the circuit court.

¶ 3                                  BACKGROUND

¶ 4     Petitioner and his co-defendant, Gregory Giles, were charged in three related cases with multiple counts of first-degree murder, residential burglary, theft, robbery, and unlawful restraint that involved the same victim, William Patterson, after beating the 84-year-old man to death. The State indicated its intent to seek the death penalty.

¶ 5     The evidence at trial established that in November 1999, Giles and Wells entered Patterson's apartment on the south side of Chicago and forcibly took money from him. On December 3, 1999, they entered his apartment a second time before killing him during the course of another robbery. They returned to the apartment the following day and stole a television set. After Patterson's body was discovered, an autopsy determined that the cause of death was strangulation.

¶ 6     According to testimony given at a pre-plea suppression hearing, Giles gave a statement to police about two weeks after Patterson's death implicating himself and Wells. Wells was picked up by the police and taken to the station. During his initial interrogation, Wells admitted to participating in a robbery, but he maintained that Giles killed Patterson. Later that night, Wells gave another statement, which apparently tracked the story Giles had told the police, implicating himself in Patterson's death. The next morning, he repeated the confession in a statement to a prosecutor. Wells said that he had hit the victim with such force that his dentures were dislodged from his mouth.

¶ 7     Following Wells's indictment, the State indicated to the defense that it would be seeking the death penalty. On April 3, 2000, Wells entered blind pleas of guilty to first-degree murder

(No. 00 CR 1820) and two counts of residential burglary (Nos. 00 CR 1821 & 1822). Assistant Public Defenders Stanton and Farrell were present. Farrell informed the court that she and Stanton had "spoken at length with Mr. Wells" who would agree to accept the blind plea, which had no set sentencing term. Farrell stated that he and co-counsel had "gone over extensively with him what this entails" and further indicated that petitioner understood that counsel would be presenting mitigation arguments at the sentencing phase and would be securing the assistance of a mitigation expert.

¶ 8    The court admonished petitioner, and informed him that by pleading guilty, he was admitting his guilt of the charges and informed petitioner that he would have an opportunity to present mitigation for sentencing. The court explained that the State was requesting a death penalty hearing in his murder case and that he could be sentenced to death, to life in prison, or to a term of up to 100 years. The court informed petitioner that based on his prior criminal history, petitioner also faced anywhere from six to 30 years for the residential burglary charges. When asked if he understood these terms, petitioner responded, "Yes, sir." The court further explained that by pleading guilty, petitioner would be giving up his right to plead not guilty and his right to a jury trial. Petitioner acknowledged that he understood his rights and that he was voluntarily waiving them. The court accepted petitioner's plea and found him guilty. Petitioner also indicated that he wanted the court, not a jury, to decide whether he was eligible for the death penalty and signed a waiver as to the eligibility and sentencing phase of his case.

¶ 9    The cases were continued for sentencing, including a death-eligibility hearing on the murder charge.  On June 4, 2003, the parties indicated that they had reached an agreement on the sentence and Wells then entered, and the trial court accepted, negotiated pleas of guilty to the three charges.   Petitioner confirmed that he was happy with the advice he received from his

attorneys. The court found that petitioner knowingly and voluntarily waived his rights and accepted his guilty plea. In accordance with the plea agreement, the trial court sentenced Wells to 30 years for murder and 15 years on each residential burglary, with all sentences to run concurrently. Wells did not file a post-plea motion or take an appeal from his conviction.

¶ 10     On March 23, 2010, seven  years later, petitioner filed a pro se hybrid 2-1401/post-conviction petition alleging that (1) his guilty pleas were coerced by counsel; (2) he did not understand the nature of and penalties for the charges to which he pled guilty; (3) there was an insufficient factual basis to support the plea; and (4) counsel were ineffective for refusing to investigate his claims of innocence and failed to file a motion to withdraw his plea.

¶ 11     On June 9, 2010, the circuit court construed the filing as a 2-1401 application and granted the State's motion to dismiss.  On February 18, 2016, this Court remanded the case for further second-stage proceedings under the Post-Conviction Hearing Act, 725 ILCS 725 ILCS 5/122-1 *et seq* (West 2016), holding that the circuit court erred in denying petitioner's *pro se* petition under section 2-1401, rather than treating it as a post- conviction petition. *People v. Wells*, 2012 IL App (1st) 102006-U.  On remand, the court denied the State's motion to dismiss the post-conviction petition and advanced the case to a third-stage evidentiary hearing to address these questions: whether petitioner was forced to plead guilty, and whether petitioner had communicated his desire to withdraw his plea and whether counsel complied with that request.

¶ 12     At the July 21, 2016 evidentiary hearing, petitioner testified that he pleaded guilty to first degree murder and two counts of residential burglary and was sentenced to 30 years in prison on June 4, 2003. Petitioner testified that he was represented by Stanton and Farrell for the plea.  He further testified that about a week after he was sentenced, but before he was transferred to the Department of Corrections, that he spoke with Farrell and mitigation expert Julie Normal, at the

Cook County Jail and told them that he had changed his mind about the plea and wanted to withdraw it. He claimed that Farrell said she would talk with Stanton and would get back to him but that did not hear back from either attorney. To his knowledge, no motion to withdraw his guilty plea or notice of appeal was filed.

¶ 13    On cross-examination, petitioner admitted that Stanton and Farrell had advised him before he entered the blind plea about what could happen if he were found guilty. Petitioner knew that he could face the death penalty. Petitioner testified that when he was sentenced according to the terms of the plea, the judge informed him of his right to move to withdraw his plea and appeal. Petitioner stated that he tried contacting Farrell and Stanton from prison several times by telephone, but Farrell's phone did not accept collect calls, and petitioner also claimed that he left a message and wrote to Stanton; he received no response. Petitioner stated that he spoke to a fellow inmate in 2009 and learned that nothing had been done in his case. In 2010, this inmate drafted a 2-1401 petition for petitioner and petitioner knew there was a timeframe for filing a motion to withdraw his guilty plea and did not do anything until his fellow inmate helped him prepare the petition. Petitioner stated that he contacted his sister about the situation, but never asked her to get in touch with Stanton or Farrell despite his unsuccessful attempts to contact them.

¶ 14    On re-direct, petitioner explained that he could not recall if the court informed him about filing a motion to withdraw his plea at the April 3rd hearing. He did recall that on June 4th the court informed him that he had a right to appeal, and that he needed to file a motion to withdraw plea. Petitioner claimed that he asked Farrell for assistance in this but that she did nothing.

¶ 15    On re-cross, petitioner testified that between April 3rd, when he entered the blind plea, and June 4, 2003, when he pleaded guilty and was sentenced pursuant to the negotiated plea, he

did not tell counsel that he wanted to withdraw his plea. Petitioner testified that it was not until after he was sentenced that he made the request to withdraw his plea. Petitioner rested.

¶ 16    Farrell testified at the hearing that she and Stanton represented petitioner in April 2003 and that she met with petitioner in the Cook County jail and also spoke with him in lockup. Stanton was negotiating petitioner's sentence with the State and was keeping her abreast of the negotiations. Farrell discussed pleading guilty at length with petitioner. At the time, the court suggested that if petitioner were to enter a blind plea, petitioner would get no more than 40 years, a sentence which could be further reduced to 35 years. Farrell explained that she and Stanton spoke with petitioner "for a long time" before he agreed to plead guilty on April 3rd. The case was then scheduled for a sentencing hearing on June 4, 2003. Farrell did not recall any additional negotiations between April 3 and June 4, 2003.

¶ 17    Before sentencing, Farrell informed petitioner that he had been offered 30 years in prison in exchange for his plea of guilty. She and Stanton spoke to petitioner "extensively" about the offer and petitioner agreed to accept it. Farrell did not recall speaking with petitioner after this. Farrell agreed that as petitioner's counsel, she tried to make sure that she got him the best deal possible and explained that if a client wished to withdraw his guilty plea, the process would depend on whether he wanted to withdraw it before the 30 days lapsed or afterward. Farrell stated, "But certainly you follow up with whatever you need to do. You have to file the court papers. You go and talk to the person." She did not recall petitioner ever telling her that he wished to withdraw his plea and that had he done so, she would have acted on it or would have informed Stanton. There was nothing in Stanton's notes indicating that petitioner had wished to

withdraw his guilty plea, and she never received any communication from petitioner after June 4th.

¶ 18    On cross-examination, Farrell recalled her involvement in plea negotiations, talking with Stanton, and going to the lockup where she and Stanton spoke to the petitioner about the blind plea.  She could not recall the exact nature of her communications with petitioner. She recalled that petitioner's case was scheduled for sentencing but that it got continued and right before the court date in June, the offer came down to 35 years and came down even more the next day. She testified that she may have gone with Stanton to tell petitioner about this but that she did not remember the results of that conversation. She explained there was no reason to visit petitioner after June 4, the day he was sentenced, because he had accepted the final plea deal. She did not normally speak to clients after they accepted a plea deal.

¶ 19    Following closing arguments on this proof, the court found as follows:

> "I've heard the testimony which included, among other things, Mr. Wells' testimony and Assistant Public Defender Erica Farrell F-A-R-R-E- L-L. I believe is how she spells her name.

> Mr. Wells was facing serious, serious charges that had substantial penalties if he were found guilty. There were plea negotiations that were in maybe a couple different stages where there was an offer that was modified, reduced to make it even better for Mr. Wells. There was a period of approximately two weeks or so for a stay of mittimus.

> Mr. Wells states that at some point after he had pled guilty that he was visited by Assistant Public Defender Farrell and told her that he wanted to withdraw his plea and that never happened. His plea was not withdrawn, mittimus was issued, he went off to the Illinois Department of Corrections.

He goes on to state that once he was in the penitentiary after a while he talked to a fellow inmate, realized that he could do something about trying to withdraw his plea. He then subsequently filed the instant petition that this Court is faced with here today.

APD Farrell testified that she never visited the defendant after the plea, that there would be no reason for her to do that. That if she had visited him after the plea and he said I want to withdraw it, she would have no problem doing that. She'd done motions to withdraw pleas before and would have had no problem with doing that for this defendant, her client, if he had actually asked her to do that. APD Farrell's testimony and APD Farrell was very, very credible.

Respectfully, I did not think that it happened the way the defendant said it did. Based on the evidence here I am going to deny postconviction petition."

¶ 20    Petitioner now appeals.

¶ 21                                  ANALYSIS

¶ 22    Petitioner argues that the circuit court erred in denying his postconviction petition following a third stage evidentiary hearing where he established that he was denied the effective assistance of counsel when his attorneys failed to consult with him concerning possible post-plea motions.

¶ 23    In cases not involving the death penalty, the Act provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 *et seq*. (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). In the instant case, the petition advanced to a third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2016). A circuit court's decision following an evidentiary hearing, where fact-finding and credibility determinations are involved, will not be reversed unless it is manifestly erroneous (*People v.*

*English*, 2013 IL 112890, ¶ 23), that is, unless the opposite conclusion is clearly evident (*People v. Coleman*, 2013 IL 113307, ¶ 98). However, whether a circuit court applied a proper legal standard is a question of law, which is subject to *de novo* review. *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 47.

¶ 24    Postconviction relief must be based on evidence that is found to be reliable after a third-stage hearing. *People v. Sanders*, 2016 IL 118123, ¶ 42. Evidence that is not credible would not place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt. *People v. Robinson*, ¶ 56 ("the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt").

¶ 25    Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Graham*, 206 Ill. 2d 465, 476 (2003). To support a claim of ineffective assistance of trial counsel, petitioner must demonstrate that (1) counsel's representation was deficient, and (2) as a result, he suffered prejudice that deprived him of a fair trial. *Strickland*, 466 U.S. at 687. To establish prejudice, petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Graham*, 206 Ill. 2d at 476. Such a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 26    In this case, whether petitioner made a substantial showing that counsel was ineffective hinged on the court's credibility assessment of petitioner and Farrell.   Petitioner testified that after he was sentenced, he told Farrell that he wanted to withdraw his plea and that Farrell told him she would talk to Stanton and get back to him.  According to defendant, neither Farrell nor

Stanton ever contacted him. Petitioner also testified that he was unable to reach Farrell or Stanton by telephone after he was transferred to prison.

¶ 27    Farrell testified that she had no communication with petitioner after June 4, the day petitioner entered his plea and was sentenced. She further stated that she had no reason to have any contact with petitioner after this date considering that he had just accepted the plea and that he had not requested to withdraw his plea. If he had requested to withdraw his plea, she would have acted according to his wishes and informed co-counsel Stanton. Farrell stated that there was nothing in Stanton's notes to suggest that petitioner had requested to withdraw his plea and she did not recall Stanton contacting her about the petitioner's case after he was sentenced.

¶ 28    These competing versions of events presented the circuit court with a credibility determination. As the record establishes, the court, as the fact finder, found Farrell to be "very, very credible" and believed her testimony that she would have filed a motion to withdraw petitioner's guilty plea had he asked her to do so. The court noted that Farrell was an experienced litigator who had much experience in filing motions to withdraw guilty pleas. As for petitioner's credibility, the court stated, "I did not think that it happened the way the defendant said it did." We therefore find that the trial court did not manifestly err when it concluded that Farrell was not ineffective for failing to file a motion to withdraw petitioner's guilty plea, as it found that Farrell testified credibly that petitioner did not ask her to do so.

¶ 29    We next consider petitioner's claim that counsel was ineffective for failing to consult with him after he entered his plea. Specifically, petitioner claims that because there is a reasonable probability that he would have filed a motion to withdraw his guilty plea had he known that his persistent claims of innocence provided a basis for such a motion, his attorneys'

failure to consult with him after his negotiated guilty plea amounted to the ineffective assistance of counsel.

¶ 30    In *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), the defendant alleged in a federal habeas petition that his trial counsel was ineffective because she failed to file a notice of appeal after she promised to do so. With respect to the "reasonableness" prong of *Strickland, Flores–Ortega* rejected a bright-line rule that counsel must always consult with a defendant regarding an appeal. *Id*. at 480. The Court noted that such a rule would be inconsistent with both *Strickland* and common sense. *Id*. at 479-80. *Flores-Ortega* did hold that in cases where a defendant argued that counsel failed to consult with him about an appeal, counsel only had a constitutionally imposed duty to consult with a defendant about the possibility of an appeal "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id*. at 480. We examine these two parts of the *Flores-Ortega* test and apply them to the facts before us.

¶ 31    As to whether a rational defendant would want to appeal, we find that no nonfrivolous grounds for appeal exist here. Defendant was granted a third stage evidentiary hearing on the issues of whether petitioner was forced to plead guilty, and whether petitioner had communicated his desire to withdraw his plea and whether counsel complied with that request. Petitioner has only raised the latter issue here. Defendant abandoned his claim that he was forced to plead guilty and does not argue it in his brief before this court as a nonfrivolous ground for appeal. Defendant in this case was asked by the trial court at the plea hearing whether any promises had been made to cause him to enter his plea of guilty, and defendant responded, "No." There are no other non-frivolous grounds for appeal.

¶ 32    We have already ruled that the court's finding that defendant did not inform his attorneys that he wanted to appeal was not against the manifest weight of the evidence.  As to whether defense counsel should have consulted with defendant after sentencing, defendant indicated that he understood that he was pleading guilty and giving up his right to a jury trial, that no one had threatened him, forced him, or promised him anything to plead guilty or to accept the agreed upon sentence.  He also stated that he was happy with the advice he received from his attorneys.  In this case defendant did plead guilty and his plea did in fact reduce the scope of potentially appealable issues.  Other than answering the court's questions, defendant made no statements during sentencing.  Although defendant did not indicate on the record that he sought an end to the judicial proceedings, we can infer from his plea that he did not wish to undergo a lengthy trial and risk a substantially longer sentence than that offered as part of his negotiated plea.

¶ 33    *Flores-Ortega* provides that " [e]ven in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.* at 480.  As to the first factor, defendant did in fact receive the sentence that he bargained for. He was informed that he would receive an aggregate sentence of 30 years and he did receive this sentence.  Defendant indicated that he understood this. The second factor is also not helpful to defendant  because, even though defendant did not waive the right to appeal his sentence, he had no nonfrivolous ground upon which to base any such appeal.

¶ 34    Accordingly, we cannot find that counsel had a duty to consult with defendant after he pleaded guilty.  We conclude that defendant has not established any ground that would have given his trial counsel "reason to think * * * that a rational defendant would want to appeal" the

sentence imposed in this case. *Id*. Thus, defendant cannot meet the first part of the *Flores–Ortega* test.

¶ 35    The second part of the *Flores-Ortega* test requires us to determine whether "there is reason to think * * * that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id*.  In making this determination, "we must take into account all the information counsel knew or should have known." *Id.*

¶ 36    For certain, defense counsel knew that petitioner had pled guilty in exchange for an aggregate 30-year sentence, after facing a possible death sentence.  The court also meticulously admonished petitioner regarding his appeal rights. Defendant indicated that he understood those rights.  Defendant never expressed any desire in open court to appeal, nor did he indicate that he was displeased with defense counsel.  Furthermore, we have already found that the court did not err when it found that petitioner did not request that counsel file an appeal.  Under these circumstances, there was simply no reason for petitioner's counsel to think that defendant would want to appeal. Accordingly, we conclude that petitioner did not " reasonably demonstrate[ ] to counsel that he was interested in appealing" (*id*.)  and he is thus unable to satisfy the second part of the *Flores–Ortega* test and therefore we cannot find that plea counsel was ineffective for failing to consult with petitioner following his plea.

¶ 37    Finally, petitioner argues that postconviction counsel was ineffective for failing to amend his petition to allege ineffective assistance under a failure to consult theory, and that she failed to tailor the evidentiary hearing to prove this claim.

¶ 38    There is no constitutional right to assistance during postconviction proceedings.  *People v. Cotto*, 2016 IL 119006, ¶ 29.  Rather, our supreme court has found that the Act provides a postconviction petitioner with a guarantee of " 'reasonable' assistance." *Id*. ¶ 30 . "[T]he

reasonable level of assistance provided for by the Act is 'less than that afforded by the federal or state constitutions.' " *Id*. ¶45 (quoting *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006)). The guarantee of reasonable assistance is found in Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), which imposes certain duties on postconviction counsel and requires that the record or a filed certificate must disclose that postconviction counsel:

> "consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 39   Rule 651(c) does not require that post-conviction counsel must file an amended petition in every case but should make only those amendments that are necessary to adequately present the defendant's claim. *People v. Turner*, 187 Ill. 2d 406, 412 (1999). It is reasonable, therefore, for counsel to stand on the *pro se* petition if it adequately sets forth the claim. Also, it is not necessary to amend the defendant's petition to develop claims that plainly lack merit, and counsel is under no obligation to do so. *People v. Greer*, 212 Ill. 2d at 205. Post-conviction counsel's filing of a certificate of compliance under Rule 651(c) "creates a rebuttable presumption that post-conviction counsel has provided the reasonable assistance contemplated by the [Post-Conviction Hearing] Act." *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 36.

¶ 40   In this case, the record shows that post-conviction counsel provided petitioner with a reasonable level of assistance. Postconviction counsel filed a filed a 651(c) certificate on June 4, 2015, stating that: (1) she consulted with petitioner in letters dated February 20, 2015 and April 13, 2015, as well as in other letters and in telephone conversations on December 13, 2013 and

April 13, 2015, to ascertain his constitutional claims; (2) she reviewed a copy of petitioner's guilty plea transcript from June 2003; and (3) she did not prepare a Supplemental Petition for Post-Conviction Relief because in her professional opinion she could not make any amendments that would better present petitioner's contentions. Accordingly, it is presumed that postconviction counsel's representation was reasonable, and it is petitioner's burden to show that it was not.

¶ 41     Petitioner argues that counsel should have amended the *pro se* petition to frame his ineffective assistance as a post-plea failure to consult issue, rather than as a failure to file a motion to withdraw following a consultation, because it was clear "based on both the trial file and on common sense" that plea counsel did not visit him after he entered the plea. Petitioner's argument is rebutted by the record.

¶ 42     In arguing that plea counsel should have filed a motion to withdraw the plea, postconviction counsel stressed that plea counsel had an opportunity to visit petitioner after trial but did not. The court found this issue to be without merit after plea counsel testified at the hearing that she would not have had any reason to speak with him after the plea proceeding was finished. Petitioner clearly obtained a ruling on the claim that counsel should have consulted him following the plea, where the trial court, in reference to plea counsel's decision not to visit petitioner, acknowledged and deferred to her decision not to do so under the circumstances. Counsel litigated petitioner's claim as set forth in petitioner's *pro se* petition — that counsel neglected to follow up on post-plea his request to file a motion to withdraw his plea by failing to consult with him. Accordingly, we cannot say that postconviction counsel was ineffective.

¶ 43                              CONCLUSION

¶ 44     For all the reasons stated herein, we affirm the judgment of the trial court.

1-17-1199

¶ 1    Affirmed.